UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
JAMISON BUSINESS SYSTEMS, INC.,
NICHOLAS DAVELLA, and
CAROL M. DAVELLA,

                            Plaintiffs,

        -against-                                            MEMORANDUM
                                                             OPINION AND
                                                             ORDER

UNIQUE SOFTWARE SUPPORT CORP.,
ALAN CASTRO, PARTY RENTAL, LTD.,                             CV 02-4887 (ETB)
and JAMES McMANUS,

                            Defendants.
--------------------------------------------------------------------x

        The plaintiffs Nicholas Davella ("Davella") and Jamison Business Systems, Inc. ("JBS"),[1]

commenced this action on September 9, 2002, pursuant to the Copyright Act of 1976, 17 U.S.C. §

101 et seq. ("Copyright Act"). The plaintiffs allege that defendant Alan Castro ("Castro"), a

former employee of JBS and officer of the defendant corporation, Unique Software Support Corp.

("Unique"), copied elements of a computer program developed by the plaintiffs, modified the

elements of the program, and then sold the modified program to the defendant, Party Rental Ltd.

("Party Rental"), through the latter's employee, James McManus ("McManus"). The plaintiffs

discontinued as to Party Rental and McManus prior to the trial herein. The defendants Unique and

Castro claim that to the extent Castro copied any portion of the plaintiffs' program, the elements

copied were so insignificant that copying them did not rise to the level of copyright infringement.

        The complaint asserts five state law causes of action: (1) replevin, (2) conversion; (3)

_____

        [1]All copyright claims on behalf of plaintiff Jamison Business Systems, Inc. and all claims
on behalf of plaintiff Carol Davella were dismissed at the conclusion of the bench trial.

wrongful competition; (4) tortious interference; and (5) misappropriation of a trade secret. The plaintiffs seek a judgment against each defendant in the amount of $75,000.00, plus $5,000 for each year any defendant has been in possession of the allegedly stolen material, in addition to actual damages and interest. (Pls.' Am. Compl. ¶¶ 61-62.) Plaintiffs additionally seek: (1) an order for the seizure and impoundment of the JBS Party Rental Program and related materials in the defendants' possession or under their control; and (2) an injunction against Castro and Unique, enjoining them from copying, distributing, selling or providing the JBS Party Rental Program and related materials to any person or entity. (Id. ¶¶ 1-5 of Wherefore Clause.)

The Court held a bench trial on November 8, 2004, and November 9, 2004. At the conclusion of the trial, the Court dismissed all copyright claims brought on behalf of plaintiffs JBS and Carol Davella, based on the lack of evidence that either held any copyright interest in the software. Defendants Unique and Castro moved to dismiss all claims based on the settlement between the plaintiff and Party Rental, Ltd. and James McManus, in which Party Rental and McManus paid plaintiffs $20,000 and provided a copy of the software Castro sold to Party Rental in exchange for being released as defendants in the action. Defendants Unique and Castro argue that because the plaintiffs recovered the full measure of damages from Party Rental and McManus, they are prohibited by New York law from a double recovery.

This Memorandum Opinion and Order constitutes the findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure.

BACKGROUND

I.      Findings of Fact

Plaintiff Nicholas Davella ("Davella")founded Jamison Business Systems ("JBS") in 1977, and has been the president of the company since its founding. (Tr. at 12.) JBS employs computer consultants and software programmers, and primarily provides programs to companies that distribute goods. Plaintiffs' clients included party rental companies that rent equipment to large companies hosting parties. (Id. at 12-13.) In 1986, JBS employees, including Davella, created the computer program at issue in this action, a party rental program ("rental program") which tracks equipment rentals. (Id. at 13.) The rental program was designed by Davella and produced with the assistance of other programmers at JBS. (Id. at 15, 25.) In 2001, Davella registered the copyright for the party rental program in his name, stating on the copyright registration application that the rental program was first published on January 20, 1986. (Id. at 13, Pl.'s Ex. B.) The rental program was later periodically modified and updated by Davella, in accordance with industry needs, through 1992. (Tr. at 95-96, 100.)

The rental program was originally designed for JBS' then-client, Broadway Famous ("Broadway"), a party rental company in Queens (Id. at 20.) JBS and Broadway had engaged in discussions for a period of eight to nine months prior to signing a contract on November 1, 1986 which licensed the JBS party rental program to Broadway for $25,000. (Id. at 21-22; Defs.' Ex. D.) The plaintiffs' relationship with Broadway ended in 1988 or 1989, when the owner of Broadway told Davella that he wanted to get an "in-house" programmer. (Tr. at 80-81.)

In November 2001, plaintiff Davella received a copy of a letter dated November 8, 2001, addressed to Michael Halperin, president of the discontinued defendant Party Rental, from Victoria Cundiff, an attorney for Broadway. (Id. at 19; See Pl.'s Ex. 7.) The letter states that Broadway had been informed that, at the request of Jim McManus, a former Broadway employee who left Broadway to work for Party Rental, the defendant Castro had provided McManus with a

3

tape containing the rental program software and files used by Broadway. (Pls.' Ex 7.) The letter also states that the tape included Broadway's confidential business information, as well as software licensed to Broadway by plaintiffs. (Id.)

Upon receiving the letter, Davella met with Broadway's president, Stan Skirloff ("Skirloff"), to inspect the software Broadway was using. (Tr. at 23-24.) Davella testified that Broadway was using the software designed by JBS. (Id.) Skirloff told Davella that Castro, Broadway's former "computer guy," had sold the software to Party Rental, a Broadway competitor. (Id. at 34, 117.) Skirloff also told Davella that Castro had done programming work for Broadway Famous for "quite a while." (Id. at 26.) Davella informed Skirloff that Castro was a former JBS employee. (Id. at 25.)

Believing Castro had made an unauthorized sale of the JBS rental program to Party Rental after leaving JBS, Davella wrote to Castro asking him to cease and desist his sale of the software, and to return any profits from such sales. (Id. at 28. See also Pls.' Exs. 8, 9, 11.) This action ensued. (See Pls.' Ex. 11.)

II.     Testimony

        A.      Plaintiff Nick Davella's testimony

                1.      Castro's Employment at JBS

Davella testified that Castro was hired by JBS in 1984, and left on amicable terms around September of 1986. (Tr. at 25.) He stated that Castro was hired as a programmer, and was told upon hiring that if he left the company, he was prohibited from going into competition with JBS for a period of five years or taking any JBS clients or programs. (Id. at 44.) I do not credit this statement. Davella stated that JBS had a policy of securing signed employment contracts with programmers when they were hired, outlining the no-compete terms, and that every employee

leaving the company was reminded of these terms during an exit interview.  I do not credit this statement.  (Id. at 48.)  Plaintiffs have provided no signed documents to support this claim. Davella testified that he was unable to find the employment contract signed by Castro when he was hired.  I do not credit this.  (Id. at 49.)  At the trial, an unsigned and undated copy of an employment agreement allegedly in place at the time of Castro's employment was admitted for the limited purpose of demonstrating the existence of this form at the time period in question.  (Id. at 50; Pls.' Ex. 1.)

2.    The Software Rental Program

Davella testified that he was the original designer of the rental program at issue in this case, and that he and his programmers worked on it together, although he could not recall if Castro in particular had worked on it.  (Tr. at 15, 78, 97.)  Davella described the program's "source code" as the English version of the code that tells a computer what to do.  (Id. at 53.)  He testified that the best way to determine if one software program is the same as another is to examine the source codes.  (Id. at 104-105.)  Davella testified that he compared the code from the software Castro sold to Party Rental[2] with the code of an updated and modified version of the JBS rental program originally designed in 1986.  He identified the software sold to Party Rental as a modified version of the JBS rental program.  (Id. at 51; 94-97.)

A printout, consisting of five to ten percent of the source code from the JBS rental program designed by Davella, was received in evidence.   (Id. at 86;  Pls.' Ex. 2.)  The other ninety percent of the program was not printed out or submitted into evidence.  (Tr. at 86.)  It is noted that the

---

[2]Davella testified that Party Rental and its employee James McManus were originally parties to this lawsuit, but that they settled the claim with JBS for $20,000.  (Tr. at 32-33.  See also Pls.' Ex. 14.)  As part of the settlement, Party Rental gave JBS a copy of the software sold to them by Castro, called "Unique Party Rental software."  (Tr.  33-34.)

source code Davella printed and submitted as evidence is not from the rental program as it was published on January 20, 1986. (Id. at 94-96.) The source code on the printouts instead came from the JBS rental program created on January 20, 1986, as modified over time. (Id.) Davella testified that "there are modifications that were made to this [program, but]. . .the vast majority of the coding that's in here is exactly the same as what I published in '86." (Id.)

A corresponding portion of the source code from the program Party Rental bought from Castro was also received in evidence. (Id. at 51-52; Pls.' Ex. 4.) Davella testified that the code from the two printouts were identical, noting the names, field lengths, names of files, and comments. (Tr. at 54, 222-224.) He testified that these categories could be given any designation, and that the two source codes were identical. (Id. at 54-55.) Davella further testified that there were references to the Broadway rental program in the program Party Rental bought from Castro, which further evidenced that the Party Rental program was a modification of his original rental program licensed to Broadway (Id. at 56.) Davella also compared the menus, templates, and template fields between the two programs, and testified that they were the same. (Id. at 61-63.) He stated that Castro made some modifications and additions to the rental program, but that overall, of the 5 to 10 percent printed out, 90 to 95 percent of the program sold to Party Rental by Castro was identical to his rental program. (Id. at 65.) Plaintiffs called no expert witness.


B.    Defendant Alan Castro's Testimony

Defendant Castro testified that he was hired by JBS in 1984 and left in 1986. He testified that he never signed a written employment contract and never orally agreed to an employment contract. (Id. at 162.) The Court credits this testimony. I conclude that there was no written or oral employment contract or non-compete agreement between JBS and Castro.

In 1988, Castro began working for Unique Software Systems ("USS"), a predecessor of the defendant, Unique. (Id. at 163.) Later that same year, USS was hired by Broadway to write a new software package. (Id. at 164-165.) Castro, as a programmer for USS, began writing the program according to requirements specified by Broadway's president at that time, Michael Svirski ("Svirski"). (Id. at 167.) Castro testified that when he started working for Broadway, Broadway had a few existing, but nonfunctional programs, so he wrote an entirely new software package, which took until 1990. (Id. at 167-68, 190.) I do not credit this testimony and conclude instead that he modified the Davella program sold to Broadway in 1986. In 1990, Svirski came up with new design requirements for the program, and Castro testified that he created six new program packages for Broadway based on these new requirements. I do not credit this testimony but rather find that Castro again made further modifications to the JBS program sold to Broadway. (Id. at 168.) Castro continued working for Broadway until 2001. (Id. at 169.)

In 1990, the owner of USS, Castro's employer, decided to close the company, and at that time Castro started his own similarly-named company, defendant Unique Software Support Corporation ("Unique"). (Id. at 163.) Castro has been president of Unique since 1990. (Id.) In 1998, Unique, through Castro, pursued Party Rental, a competitor of Broadway, as a client. (Id. at 170-72.) Castro testified that he showed Party Rental the software package he had created for Broadway, and testified that Party Rental didn't like it. (Id. at 171.) I do not credit this testimony. Castro also stated that Party Rental asked Castro to modify 75-80% of the program to meet its needs. (Id. at 172; 198-99.) I do not credit this testimony. He testified that in order to meet Party Rental's needs, he took minor features such as the menus of the original JBS rental program, wrote the program for Broadway, and then built upon the program he wrote for Broadway to create the program he sold to Party Rental for $20,000. (Id. at 198, 201, 210-213. See also Pls.' Exs. 6, 10;

Defs.' Ex. A.)  I do not credit this testimony.  Instead I find that Castro unlawfully took a copy of Broadway's software program and sold it to Party Rental with modification for $20,000, with the assistance of defendant McManus.


       C.      <u>Stan Skirloff's Testimony</u>

Stan Skirloff ("Skirloff") testified at trial that he has been the primary owner and CEO of Broadway since November 1, 1997, when he bought the company from then-owner Mike Svirski. (Tr. at 115.)  Skirloff testified that he first met defendant Castro shortly after he bought the company, probably sometime in November of 1997.  (<u>Id.</u> at 117.)  He stated that Castro was the person who fixed and updated Broadway's computer system.  (<u>Id.</u>)  He further testified that Castro did not have a contract with Broadway.  (<u>Id.</u> at 118.)

Skirloff stated that when he took over Broadway, the computer system was fully functioning, and that it was "the backbone of the company."  (<u>Id.</u> at 119.)  I credit this testimony. He testified that the only shortcoming was that the program was not tied to the accounting program in their use, and that this is why he decided to move to another program.  (<u>See</u> <u>id.</u> at 120.)

Skirloff testified that in 2001 he called Castro to ask him to come to Broadway and fix the computers, and he was given the phone number for Party Rental and told that he could find Castro at that number.  (<u>Id.</u> at 123, 130.)  Skirloff stated that when he confronted Castro about being at Party Rental, Castro told him that he was installing Broadway's program on Party Rental's computers.  (<u>Id.</u> at 125.)  I credit this testimony.  Skirloff testified that Castro told him that Jim McManus, a former Broadway employee who left to work for Party Rental, asked Castro to do computer work at Party Rental.  (<u>Id.</u> at 127.)  Skirloff further testified that in 2001 or 2002  he discovered that two of Broadway's "backup" tapes containing the company's computer program

with all of its client data were missing.  (Id. at 128-9.)  I credit this testimony.

Upon discovering that Party Rental had been provided a copy of Broadway's rental program and business data, Broadway's attorney sent a letter to Mike Halperin at Party Rental, demanding that it stop using Broadway's program and data, and threatening to sue.  (Id. at 130-31. See also Pls.' Ex. 7.)  After receiving the letter, Skirloff testified that Party Rental admitted to him that they had received and been using Broadway's program and confidential business data.  (Id.)  I credit this testimony.  Skirloff stated that Party Rental and Broadway ultimately reached a settlement agreement, by which Party Rental returned the program tape to Broadway, in addition to paying Broadway $30,000.  (Tr.  at 131-33; see also Pls.' Ex. 12A.)  I credit this testimony.

Skirloff also testified that on learning that Party Rental was using Broadway's program, he contacted Davella and told him that Castro had installed Broadway's program, written by the plaintiffs, on Party Rental's computers.  (Tr.  at 143.  See also Pls.' Ex. 12A.)


Based on the testimony of all three witnesses, I find that in 1986, plaintiffs sold the JBS rental program to Broadway for $25,000.  In 1988 Broadway hired USS, the company Castro was then working for, to modify the software.  In writing this package, there is no question that Castro had access to the rental program plaintiffs sold to Broadway, and modified the plaintiffs' rental program to meet Broadway's needs.  In 1990, when defendant Castro started his own company, he solicited business from Broadway's competitor, Party Rental.  The program he wrote for Party Rental was based on the program that he had unlawfully taken from Broadway, which plaintiffs had licensed to Broadway.  The parties disagree over how much of the plaintiffs' program was used by defendant Castro in writing his programs for Broadway and Party Rental– the plaintiffs argue that 90 to 95 percent was copied, Castro contends that only insignificant aspects, such as the

menu screens, were copied.  I reject defendants' de minimus claim and find that substantial parts of JBS' original rental program were copied by the defendants.  There is no evidence however to support plaintiffs' claim that 90 to 95 percent of the Broadway program was copied, since only 5 to 10 percent of the Party Rental program was introduced as evidence.

DISCUSSION

III.    Copyright Infringement

The Copyright Act of 1976 (the "Act") provides copyright protection to "original works of authorship fixed in any tangible medium of expression," including computer programs, which fall under the Act's protection as "literary works."  17 U.S.C. § 102(a).  The Act provides authors of copyrighted works a set of exclusive rights, including the right "to prepare derivative works based on the copyrighted work."  Id. § 106(2). In the case of computer programs, an updated or modified version of an original program constitutes a derivative work.

A.    Legal Standard for Copyright Infringement

To establish copyright infringement, a plaintiff must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); Computer Assoc. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 701 (2d Cir. 1992).  To satisfy the first prong in Feist, "plaintiff must prove that the work as a whole is original and that the plaintiff complied with applicable statutory formalities."  Lotus Dev. Corp. v. Borland Int'l, Inc., 49 F.3d 807, 813 (1st Cir. 1995), aff'd by 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996) (5-4 decision).

1.    Ownership of a Valid Copyright

a.    Date of Registration

The Copyright Act provides that "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded to the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c).

In this case, Davella obtained a copyright registration certificate for the software, in his name, on November 23, 2001. (Defs.' Ex. B.) The certificate states that the first publication of the software was January 20, 1986, more than five years prior to the date of registration. (See id.) Therefore, the copyright certificate does not establish prima facie evidence of the copyright's validity, and the evidentiary weight of the certificate is within the Court's discretion.

Defendants do not challenge the validity of the certificate on the grounds that the lapse of time between publication and registration suggests that the facts stated in the certificate may be unreliable, which was the foremost concern contemplated by the advisory committee reviewing the registration provision. See 17 U.S.C. § 410(c) (1996), Notes of Committee on the Judiciary, House Report No. 94-1476. Instead, defendants argue that because plaintiffs did not have a copyright registration certificate at the time that defendant Castro produced and sold his software to Party Rental, defendants' software could not possibly have violated plaintiffs' copyright. This argument is without merit, and evinces a fundamental misunderstanding of copyright protection. Chere Amie, Inc. v. Windstar Apparel, Corp., 191 F. Supp. 2d 343, 350 (S.D.N.Y. 2001) (rejecting this same argument by defendant). "Copyright exists automatically upon the creation and fixation of an original work of authorship in a tangible medium of expression. See 17 U.S.C.

11

102(a). The Copyright Office does not grant copyrights, registration merely bestows certain prima facie benefits." Id. (citing 17 U.S.C. § 410(c); SHL Imaging, Inc. v. Artisan House, 117 F. Supp. 2d 301, 305 (S.D.N.Y. 2000)).  The Court finds the Davella registration issued on November 23, 2001, is sufficient evidence of his publication of the rental software on January 20, 1986.

b.     Owner of Registration

Plaintiff Davella registered the rental program in his name alone.  However, Davella testified at trial that he designed the software, but that it was produced by JBS programmers with his assistance.  The Copyright Act states that the author of a given work is "the person who translates an idea into a fixed, tangible expression entitled to copyright protection." Community For Creative Non-Violence v. Reid, 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (citing 17 U.S.C. § 102).  If  Davella had designed and written the code for the rental program entirely on his own, he would be considered the author for purposes of copyright protection.  The Act, however, contains an important exception for "work prepared by an employee within the scope of his or her employment." See 17 U.S.C. § 101. Under this "work-for-hire" exception, "[t]he employer. . .is considered the author. . .and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights comprised in the copyright." 17 U.S.C. § 201(b).  In this case, since the work was prepared by several employees in the scope of their employment, in addition to Davella, the program is a "work for hire." Since the employees were working for JBS, not Davella, JBS is the author of the software, and the registration should be in JBS' name.

However, this mistake could be easily corrected through the filing of a supplementary copyright registration (see 17 U.S.C. § 408(d)), and courts generally have not dismissed cases

based on innocent errors made on the registration application.  See, e.g., Nimmer & Nimmer,  §

720[B] at 7-208 ("The courts generally have been most lenient ... with respect to any innocent

error contained in an application for a registration certificate."); 1 Paul Goldstein, Copyright §

3.12.3, at 345 (1989) ("Courts have excused innocent errors or omissions affecting virtually every

material aspect of a copyright registration application.").

 In Thomas Wilson & Company, Inc. v. Irving J. Dorfman Company, Inc., 433 F.2d 409, 412

(2d Cir. 1970), the court considered a situation identical to the circumstances here,  in which the

president of a small company named himself as author on the copyright registration form instead of

properly naming the corporation.  The court rejected the defendant's argument that the copyright

registration was invalid based on this error, holding instead that the error "was minor, was made

in good faith, and could not have affected the action taken by the Copyright Office."  Thomas

Wilson & Company, Inc. v. Irving J.  Dorfman Company, Inc., 433 F.2d 409, 412 (2d Cir. 1970)

(citing Pantone, Inc. v. A.I. Friedman, Inc., 294 F. Supp. 545, 551 (S.D.N.Y. 1968)).  In Computer

Associates International, Inc. v. Altai, the court also rejected defendant's argument that the case

should be dismissed based on a technical deficiency with the plaintiff's copyright registration.  In

Altai, the plaintiff registered the work as a "derivative work" without having first registered the

original work from which the work in question was derived.  Altai, 775 F. Supp. 544, 556-557

(E.D.N.Y. 1991), overturned on other grounds, 982 F.2d 693, 701 (2d Cir. 1992).  The court noted

that although the work should have been described as an "original work" when it was registered,

the error was technical in nature, and describing it as an "original work" at the time the

registration was obtained would not have affected anyone's right with respect to the work.  Altai,

775 F. Supp.  544 at 557 ("A formalistic dismissal, followed by a re-registration and

commencement of a new action, is unnecessary and would be wasteful.").

The error here is one made in good faith. Moreover, the copyright validity is not challenged by the defendants. Based on the foregoing, the Court declines to dismiss this action based on the technical error in plaintiffs' copyright registration, and instead recognizes the validity of Davella's registration.


c.      Protection for a Derivative Work

The author of a copyrighted work has the exclusive right to prepare a derivative work based on the original copyrighted work. 17 U.S.C. § 106(2). In the case of computer programs, an updated or modified version of an original program constitutes a derivative work. A derivative work created by the author of the original work falls within the scope of the original work's protection to the extent that the material in the derivative work incorporates the original copyrighted work. Well-Made Toy Mfg. Corp. v. Goffa Intern. Corp., 210 F. Supp. 2d 147, 157 (E.D.N.Y. 2002).

Plaintiff Davella registered the original version of his rental program as written in 1986. At trial, he introduced as evidence portions (five to ten percent) of the source code from his rental program as it had been updated and modified over the course of several years, through 1992. (Tr. at 105-06.) The defendants argue that because plaintiff Davella compared the source code from the updated version of his program, not the original, with defendant Castro's program, Davella could not prove that the defendants violated plaintiffs' copyright in the original program. This argument is without merit.

14

While the additions to the program constitute elements of a derivative work, and the modified versions must be registered as derivative works in order protect the modifications, any original unmodified source code is entitled to protection as part of the original work registered in 1986.  See Well-Made Toy Mfg. Corp. v. Goffa Intern. Corp., 210 F. Supp. 2d 147, 157 (E.D.N.Y. 2002) ("[W]here the preexisting work is registered, but the derivative work is not, a suit for infringement may be maintained as to any protected element contained in the registered preexisting work, but not as to any element original to the unregistered derivative work.") (citing Mattel, Inc. v. Robarb's, Inc., 139 F. Supp. 2d 487, 496, 498 (S.D.N.Y.2001) (holding that defendant's copy of plaintiff's unregistered derivative work infringed on plaintiff's copyright in the registered work, elements of which were included in the unregistered derivative work and the infringing copy)).

Here, plaintiffs do not allege that Castro copied elements of the modified program, even though plaintiffs submitted the modified version of the program as evidence.  The modified version of the program encompassed the original source code, and it is that original source code which Castro has copied. (Tr. at 54-56.)

B.      Copying of Constituent Elements of the Work

In order to satisfy the second prong of the Feist test and establish copyright infringement, a plaintiff must prove that the defendant copied the copyright work.  Feist Publications, Inc.  v. Rural Tel.  Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991).  The plaintiff can do this either by direct evidence, or by showing that, "(1) the defendant had access to the plaintiff's copyrighted work and (2) that defendant's work is substantially similar to the plaintiff's copyrightable material."  Computer Associates Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 701 (2d Cir. 1992) (citing Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir. 1986)), cert

denied, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed. 2d 721 (1986)).

Direct evidence of copying is seldom available. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003). In cases where direct evidence is unavailable, the plaintiff must prove the defendant had access to the work and that the work is "substantially similar" to the plaintiff's copyrightable material. Altai, 982 F.2d at 701. Proving substantial similarity can be a difficult burden when the plaintiff's evidence, as in this case, constitutes only a fraction of the two works. At trial, the defendants argued that because Davella submitted in evidence and compared only five to ten percent of the source code from his program with the relevant portions of the Party Rental program, plaintiffs did not prove infringement.

The defendants' argument is without merit. This is one of the rare instances where the plaintiffs have presented direct evidence of copying. Accordingly, the plaintiffs are not required to prove access and substantial similarity, since both can be inferred from evidence of direct and exact copying. See, e.g., Computer Assoc. Int'l v. Altai, Inc., 775 F. Supp. 544, 557 (E.D.N.Y. 1991) (stating that generally a plaintiff must prove access and substantial similarity, except in situations where there is direct evidence of copying).

In this case, printouts of the source code from the JBS rental program and the defendants' program evidence direct copying. By way of example, at trial, plaintiff Davella compared pages five and six of the source code from the JBS program with the corresponding sections of the program defendant Castro claims to have designed. (Tr. at 54-56.) Davella stated, "the names are identical, the field lengths are identical, the comments. . . are identical." (Id.) Upon the Court's review of the source code from the two programs, it is clear that, apart from the line numbers at the beginning of each line of code, significant portions of the source code are indeed identical.

(<u>Compare</u> Pls.' Ex. 2 <u>with</u> Pls.' Ex. 4.)

Furthermore, Castro acknowledged copying some of the program. On cross-examination, in response to being asked if he used any of the JBS program in preparing a program for Party Rental in 1998, he responded, "Basically just the menus. . . rather than re-create something that simple, we took the menus and built upon that." (Tr. at 198.) Castro never directly admitted copying source code, but he testified that, "If you take 2000 [fields], you might find one field the same." (<u>Id.</u> at 210.) He then went onto state that "Fields in the program are one little situation. It's the calculations that actually run the program. It's the calculations that actually bring it to the screen. It's the calculations that actually make the program work, okay." (<u>Id.</u> at 210-11.) Lastly, I credit the testimony of Broadway's CEO, Skirloff, who discovered the unauthorized removal of its tapes and the sale of those tapes to Party Rental.

Defendant Castro's testimony suggests that because the menus are "simple" to create, it is not copyright infringement to take them and build upon them. With regard to the source code, he seems to take the position that even if field names in the code happen to be the same, they are a minor piece of the programs, and not fundamental to making the programs work. While the defense never explicitly states a "de minimus defense" in any of their pleadings, Castro's testimony suggests that any copying was so insignificant as to be "de minimus."

C.    <u>Constituent Elements of the Work</u>

The Supreme Court stated in <u>Feist</u> that in order to establish copyright infringement, a party must prove copying of "constituent elements of the work that are original." <u>Feist Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). In other words, "It is not enough for the plaintiff to establish that the defendant copied all or some of

the work in question; the plaintiff must also establish that the copying in question is unlawful."

O.P Solutions, Inc. v. Intellectual Property Network, Ltd., 1999 WL 47191, at *5 ( S.D.N.Y. Feb. 2, 1999). For example, elements of a work from the public domain, or unoriginal elements of a work, such as facts, are not afforded any copyright protection. Feist, 499 U.S. at 1290. The Second Circuit noted in Altai that "Congress made no special exception for computer programs. . . copyright protects computer programs only 'to the extent that they incorporate authorship in programmer's expression of original ideas, as distinguished from the ideas themselves.'" Computer Assoc. Int'l v. Altai, Inc., 982 F.2d 693, 703 (2d Cir. 1992) (citing H.R.Rep. No. 1476, 94th Cong., 2d Sess., 54, reprinted in 1976 U.S.C.C.A.N. 5659, 5670). Determining which components of a computer program are afforded copyright protection can be particularly challenging. See Altai, 982 F.2d at 696 ("[T]his case deals with the challenging question of whether and to what extent the 'non-literal' aspects of a computer program, that is, those aspects that are not reduced to written code, are protected by copyright.").

In this case, neither party offered any expert testimony or even attempted to reference Altai, a seminal computer program copyright case in the Second Circuit. Instead, the plaintiffs simply argued that their entire program was protected by copyright. For their part, defendants Castro and Unique argued that Castro did not copy the JBS program's source code, and that any copying he might have done of the menu screens was insignificant or not protected material. The Court here will focus its analysis on two aspects of the program: the rental program's source code, a "literal" aspect of the program, and the program's menu screens, a "non-literal" aspect of the program. See Altai, 982 F.2d at 702 (discussing literal and non-literal elements of a computer program).

1. Source Code

As the Second Circuit has noted, "It is now well settled that the literal elements of computer programs, i.e., their source and object codes, are the subject of copyright protection." Altai, 982 F.2d at 702. Courts have not accepted a "de minimus" defense where there is evidence the defendant copied a program's source code, as opposed to other elements of the computer program. For example, in Altai, the defendant admitted to copying approximately 30% of the plaintiff's program from the plaintiff's source code. Id. The district court found this to be infringement. Computer Assoc. Int'l, Inc. v. Altai, Inc., 775 F. Supp. 544 (E.D.N.Y. 1991). In Dun & Bradstreet Software Services, Inc., the defendant admitted copying some, but not all, of the plaintiff's source code. Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc., 307 F.3d 197, 213 (3d Cir. 2002). The court there concluded that "[source code] infringement may not be justified on the ground that not all elements of the system were copied or that there were some dissimilarities. [The defendant] may have rearranged some of the words in the plagiarizing program or altered or replaced one or more components in its program, but these efforts to distinguish its program from [the plaintiff's] system does (sic) not erase the literal copying of [the plaintiff's] source code." Id. at 213-214. The court further noted that when source code is copied, there is no requirement that most of each of the two works be compared. See id. at 214.

Here, in addition to rejecting defendants' "de minimus" argument, I also reject the defendants' suggestion that the similarities between the two programs resulted from coincidence. Comparison of the two programs confirms Castro's copying. While it is conceivable that some abbreviated terms may be commonly used by programmers, for example "ORD ENT" for "order entry" (see Tr. at 197), the similarity between the two programs in this case extends beyond

19

common and convenient abbreviations. For example, on page five of the source code from the JBS

program and page six of the source code from defendant Castro's program, several consecutive

lines of code read: "1 1 OCDEL; 2 60OCORD; 7 90OCLINE; 10 120OCCOML; 14 16 OCCAC;

17 46 OCCAD; 47 572OCCA$; 58 611OCDSC; 75 75 OCTYPE; 14 74 OCCOM."

(Compare Pls.' Ex. 2, at 5 with Pls.' Ex. 4, at 6.) The comments associated with each of these

lines of code are also identical. (See id.) The identity of these lines of code, among others,

confirms copying, not coincidence. See Fabkom, Inc. v. R.W. Smith & Associates, Inc., 1996 WL

531873, at *12 (S.D.N.Y. Sept. 19, 1996) (noting that similarity in the order of entries and

headings in the source code suggests that "[i]t is difficult to believe that such substantial

similarities are attributable merely to coincidence"). Accordingly, I find that plaintiffs have

prevailed on the copyright infringement cause of action based on Castro's copying of the JBS

program's source code.

2.      Menu Command Screens

A relatively early case in this circuit established that a computer program and its

screen displays are, for copyright purposes, fundamentally distinct. Manufacturers Technologies,

Inc v. Cams, 706 F. Supp. 984, 992 (D. Conn. 1989). The court in Manufacturers Technologies

explained that the computer program is designed to direct the computer to perform a task, whereas

the screen displays are designed to enable the user to effectively use the program. Id. at 993.

However, only some, not all, of the elements of a screen display are protected by copyright. Id. at

993-995. For example, elements of a screen display that evidence unique arrangements, not driven

by adopted conventions or efficiency constraints, are protectable. Id. On the other hand, elements

such as the uniform formats of the pages, the method of navigation (i.e. using the return key to

select a highlighted item from a list), and the arrangement of information in columns on the screen are not protectable.  Id. at 995-999.  The Second Circuit has noted that "'in many instances, it is virtually impossible to write a program to perform particular functions in a specific computing environment without employing standard techniques.'"  Altai, 982 F.2d 693, at 709 (quoting Nimmer on Copyright, 3 Nimmer § 13.03[F][3], at 13-65).  The court there further noted that extrinsic considerations, such as demands of the industry being serviced and standard programming practices, may constrain the design and appearance of a program.  Altai, 982 F.2d 693, at 709 (citing Nimmer on Copyright, 3 Nimmer § 13.03[F][3], at 13-66-71).

In Lotus Dev. Corp. v. Borland Int'l., Inc, the First Circuit directly addressed the issue of whether a computer menu command screen constitutes copyrightable subject matter.  Lotus Dev. Corp. v. Borland Int'l., Inc., 49 F.3d 807 (1st Cir. 1995), aff'd by an equally divided Court, 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996).  In Lotus, the defendant company admitted to copying the plaintiff's menu command hierarchy for use in a program it designed to compete with the plaintiff's program.  Id. at 813.  The court explained that the menu command hierarchy is the series of menu commands, such as "copy," "print," and "quit," which allows users to control a program.  Id. at 809.  In the programs there at issue, users could choose commands by either highlighting the command on the screen or by typing the  first letter of the command.  Id.  The plaintiff's program there arranged the commands into numerous menus and submenus, all of which the defendant had copied.  Id. at 810.  The defendant argued that the menu command hierarchy was "not copyrightable because it is a system, method of operation, process, or procedure foreclosed from protection by 17 U.S.C. § 102(b)."  Id. at 812.  The court agreed with the defendant, holding that the menu screen hierarchy was an uncopyrightable "method of operation" by which the users

tell the computer what to do. Id. at 815-816.[3]  The court likened the menu commands to the buttons on a VCR, which allow the user to "play," "stop," or "eject" a tape.  Id. at 817.  Such methods of operation are not copyrightable because they do not constitute the "original expression" that copyright law was developed to protect.  Id. at 818.  "Copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work. . . Original developers are not the only people entitled to build on the methods of operation they create; anyone can."  Id.

Plaintiffs submitted as evidence the menu command screens from the JBS program and the menu command screens from the program defendant Castro sold to Party Rental.  (See Pls.' Ex. 2B; Pls.' Ex 4C.)  Plaintiffs' Exhibit 2B consists of copies of eighteen "menu command hierarchy" screens, each of which allows the program user to instruct the program to perform certain functions.  (See id.)  Plaintiff Davella testified that certain items on the menu screens from each program were identical.  (Tr. at 61.)  For example, the first page shows the "Broadway Famous Invoicing Menu."  (See id. at unnumbered page 1.)  This menu gives the user the option to: "11. Print One Invoice by Order Number; 12. Print All Invoices by Del Date; 13. Order Status Listing (by ord#); 14. Order Status Listing (by inv#)."  (See id.)  Plaintiffs' Exhibit 4C consists of copies of the menu command screen from Party Rental's software.  (Pls.' Ex. 4C.)  The page showing the Party Rental invoice menu includes more command options than the JBS program, but command options eleven through fourteen are identical to command options eleven through fourteen from th

---

[3] The court in Lotus carefully distinguished between the menu command hierarchy and the screen displays, stating that the screen displays themselves were not part of the program's "method of operation."  Lotus, at 816.  Like other courts, the court left open the possibility that elements of screen displays may constitute protectable original expression, but made clear that the menu commands on screen displays are not protectable.  Id.

JBS program's menus. (Compare Pls.' Ex. 2B at unnumbered page 1 <u>with</u> Pls.' Ex. 4C at unnumbered page 3.) Each command menu from defendant Castro's program includes entries identical to the corresponding command menu from plaintiff's program. (Compare Pls.' Ex. 2B <u>with</u> Pls.' Ex. 4C.)

These menus are the "methods of operation" by which the user tells the computer what to do. <u>Lotus</u>, 49 F.3d at 815-16. Accordingly, they are not protectable elements of the JBS program, and Castro did not infringe plaintiffs' copyright by copying the menu command hierarchy for use in his own program. <u>See</u> 17 U.S.C. § 102(b) (excluding "methods of operation" from the scope of copyright violation).

IV.     <u>State Law Causes of Action</u>

    A.     <u>Preemption</u>

The Copyright Act specifically preempts all state rights equivalent to those rights which can be asserted pursuant to federal copyright law. <u>Davis v. Trojer</u>, 2001 WL 829872 at *2 (S.D.N.Y. July 20, 2001) (citing <u>American Movie Classics Co. v. Turner Entertainment Co.</u>, 922 F. Supp. 926, 930 (S.D.N.Y. 1996)). <u>See</u> <u>also</u> 17 U.S.C. § 301(a). When analyzing whether a state law claim is preempted by the Copyright Act, the court must determine whether the work falls within the subject matter of copyright as defined by the Act, and if so, whether the state law right asserted is equivalent to any of the exclusive rights within the general scope of copyright specified in 17 U.S.C. § 106. <u>Davis v. Trojer</u>, 2001 WL 829872 at *2 (citing <u>Universal City Studios, Inc. v. Nintendo Co. Ltd.</u>, 615 F. Supp. 838, 856 (S.D.N.Y. 1985)). <u>See also</u> <u>Nat'l Basketball Ass'n v. Motorola, Inc.</u>, 105 F.3d 841, 848 (2d Cir. 1997) (referring to this as the "general scope" requirement). "If the state law claim requires an extra element 'instead of or in addition to the acts

of reproduction, performance, distribution or display. . .then the right does not lie within the general scope of copyright, and there is no preemption.'" Lennon v. Seaman, 63 F. Supp. 2d 428, 435 (S.D.N.Y. 1999) (citing Computer Assoc. Int'l v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992)).  Furthermore, the extra element required by the state law claim must alter the nature of the claim such that it is qualitatively different from a federal copyright claim.  Computer Assoc. Int'l, Inc. v. Altai, 982 F.2d 693, 716-717 (2d Cir. 1992) (referring to this as the "extra element" test) (citing Mayer v. Josiah Wedgwood & Sons, Ltd., 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985); Harper & Row, Publishers, Inc. v. Nation Enter, 723 F.2d 195, 201 (2d Cir. 1983), rev'd on other grounds, 471 U.S. 539, 105 S.Ct.  2218, 85 L.Ed.2d 588 (1985)).  To determine whether a claim is qualitatively different, the court should consider "what [the] plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004) (quoting Altai, 982 F.2d at 716).

B.      Plaintiffs' State Law Causes of Action

Plaintiffs' complaint in this case alleges five state law causes of action: (1) replevin; (2) conversion; (3) wrongful competition; (4) tortious interference; and (5) misappropriation of a trade secret.  Plaintiffs' allegations clearly meet the "general scope" requirement discussed above, since the JBS rental program  is  protected under copyright law as a "literary work." 17 U.S.C. § 102(a).

The plaintiffs' replevin, conversion, and misappropriation of a trade secret claims are all time-barred by the three-year statute of limitations set forth in N.Y. C.P.L.R. § 214.  However, "the statute of limitations is an affirmative defense under Fed.  R. Civ. P. 8(c) that must be asserted in a party's responsive pleading 'at the earliest possible moment' and is a personal defense that is

waived if not promptly pleaded." <u>Davis v. Bryan</u>, 810 F.2d 42, 44 (2d Cir. 1987) (citations omitted). If a defendant fails to assert the defense, the district court should not raise it <u>sua sponte</u>. <u>Id.</u> (citations omitted). Here, the defendants did not plead or prove the statute of limitations in its answer to any of the plaintiffs' state law causes of action. Accordingly, the defendants have waived this defense. The Court will not consider the statute of limitations in the following analysis of plaintiffs' state law claims.

1.    <u>Replevin</u>

To establish a claim for replevin, the plaintiff must prove two elements: (1) that plaintiff has a possessory right superior to that of the defendant; and (2) that plaintiff is entitled to the immediate possession of that property. <u>See</u> <u>Pivar v. Graduate School of Figurative Art of the N.Y. Academy of Art</u>, 290 A.D.2d 212, 213, 735 N.Y.S.2d 522 (1st Dep't 2002); <u>Bendheim v. Butler</u>, 255 A.D.2d 664, 664, 679 N.Y.S.2d 460 (3d Dep't 1998). Further, "when the respondent maintains legal possession of the property, the claimant must also demonstrate a demand and refusal for the return of the chattel." <u>Valjean Manufacturing, Inc. v. Werdiger, I</u>nc., 2005 WL 356799, at *17 (S.D.N.Y. Feb. 14, 2005) (citations omitted).

In this case, plaintiffs' claim meets the requirements of a replevin cause of action. By virtue of Davella's copyright registration, plaintiffs have shown superior ownership of and entitlement to the portions of the JBS program defendant Castro copied. Further, Davella made a demand for the return of the program, and the defendants refused. (<u>See</u> Pls.' Exs. 8, 9, 11).

Typically, the remedy in a replevin action is the return of the property. <u>Valjean Manufacturing, Inc. v. Werdiger, Inc.</u>, 2005 WL 356799, at *17 n.19 (S.D.N.Y. Feb. 14, 2005) (citations omitted). <u>See also</u> C.P.L.R., Article 71, Practice Commentaries (stating that the primary

25

purpose of the common law action of replevin was "to restore possession of a chattel to the person from whom it was wrongfully taken.").  In a replevin action, a plaintiff is entitled to the property's replacement value,  measured at the time of trial, only where repossession of the property is impossible.  Stengel v.  Black, 2004 WL 1933612, at *2 (S.D.N.Y. 2004) (citing Satterwhite v. Harriman Nat. Bank & Trust Co., 13 F. Supp. 493, 499 (S.D.N.Y.1935); Spear v. Auto Dealers' Discount Corp., 278 N.Y.S. 561, 561-62 (N.Y. Sup. Ct. 1935).

Here, the return of the copyrighted portions of plaintiffs' program is possible. Accordingly, the plaintiffs are entitled to the return of the portions of the defendants' program copied from the JBS program.

### 2.    Conversion

To establish a claim for conversion, a plaintiff must demonstrate that: (1) the property at issue belonged to the plaintiff; (2) that the defendant deprived the plaintiff of use of that property; (3) that the defendant's conduct was unauthorized; and (4) that the defendant's conduct harmed the plaintiff.  See Key Bank of New York v. Grossi, 227 A.D.2d 841, 642 N.Y.S.2d 403 (3d Dep't 1996), Ahles v. Aztec Enterprises, Inc., 120 A.D.2d 903, 502 N.Y.S.2d 821 (3d Dep't 1986); Meese v. Miller, 79 A.D.2d 237, 436 N.Y.S.2d 496 (4th Dep't 1981).

To the extent that a conversion claim relates to actual tangible property, the claim is not preempted by federal copyright law.  Logicom Inclusive, Inc. v. W.P. Stewart & Co., 2004 WL 1781009, at *17 (S.D.N.Y. Aug. 10, 2004); Lennon v. Seaman, 63 F. Supp. 2d 428, 436 (S.D.N.Y. 1999).  "However, if a party seeks damages for unauthorized use by defendants in a manner that is equivalent with rights protected by § 106 [of the Copyright Act]," the claim should be preempted. Logicom, 2004 WL 1781009, at *17 (S.D.N.Y. Aug. 10, 2004) (making this distinction in the

context of a copyright claim based on the unauthorized use of a computer program, and noting that plaintiff's claim "is actually based not on the physical possession of plaintiffs' programs itself (sic), but defendants' derivative use of the programs").

In this case, plaintiffs' conversion claim fails for several reasons. The plaintiffs failed to meet the first element of a claim for conversion. The copy of the program that Castro took did not belong to the plaintiffs, it belonged to Broadway. See Krause v. Titleserv, Inc. 402 F.3d 119, 124 (2d Cir. 1995) (holding that client who purchased a copy of a computer program from a consultant owned the copy of the program); Aymes v. Bonelli, 47 F.3d 23, 25-6 (2d Cir. 1995) (holding that where defendants purchased a copy of a computer program from plaintiff, defendants were rightful owners of that copy of the program). Further, defendant Castro's use of Davella's source code did not prohibit plaintiffs from using the code, because defendant Castro took a copy of the code, and plaintiffs still had the original code. Finally, the situation in this case leans more toward the facts of Logicom, in which the plaintiffs' claim was based not on the physical possession of plaintiffs' programs themselves, but instead on defendants' derivative use of the programs. Logicom, 2004 WL 1781009, at *17 (S.D.N.Y. Aug. 10, 2004). Based on this distinction, the court in Logicom held that plaintiffs' claim for conversion was preempted by federal copyright law. Id.

Accordingly, the plaintiffs' claim for conversion is dismissed.

### 3. Unfair Competition

To prevail on an unfair competition claim, a plaintiff must prove that: (1) his product is entitled to protection; (2) defendant's unauthorized use of the product is likely to cause confusion; and (3) defendant's unauthorized use of the product was in bad faith. See Jeffrey Milstein, Inc. v. Greger, Lawler, Roth, Inc. (2d Cir. 1995) ; Metropolitan Opera Ass'n v. Wagner-Nichols

Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483 (N.Y. Sup. 1950), affirmed by 279 A.D. 632, 107 N.Y.S.2d 795 ( 1st Dept. 1951); Leader Enterprises v. Television Fashion Fair, 80 N.Y.S.2d 186, 188 (N.Y. Sup. 1947).

Some courts have held that when a state law claim for unfair competition is related to a misappropriation claim, the state law is preempted by the federal copyright laws. Davis v. Trojer, 2001 WL 829872, at *3 (S.D.N.Y. July 20, 2001) (citing Warner Bros. Inc. v. American Broadcasting Companies, Inc., 720 F.2d 231, 247 (2d Cir.1983); Arden v. Columbia Pictures Industries, Inc., 908 F. Supp. 1248, 1264 (S.D.N.Y.1995)). Still, at least one court has held that unfair competition claims based on misappropriation are not preempted by federal copyright law, because unfair competition claims require the plaintiff to prove an "extra element" beyond what is required by federal copyright law. Unfair competition under New York law requires a showing as to the likelihood of confusion between the plaintiff's product and the defendant's product. Silverstein v. Penguin Putnam, Inc., 2003 WL 1797848, at *8 (S.D.N.Y. April 4, 2003).

The issue of preemption does not need to be decided in this case because plaintiffs' claim fails for other reasons. Plaintiffs' claim that defendants' taking of the program and the back-up tape containing the program were "acts of illegal competition by use of a competitors' (sic) confidential and federally protected business secrets." (Pls.' Am. Compl. ¶ 51.) Plaintiffs' proof is not sufficient to support an unfair competition claim. In order to prevail on an unfair competition claim, a plaintiff must also make a showing that the defendant's unauthorized use of the program was likely to cause confusion. Kane v. Comedy Partners, 2003 WL 22383387, at *8 (S.D.N.Y. Oct. 26, 2003) (dismissing plaintiff's unfair competition claims where plaintiff could not prove reasonable likelihood of confusion). Based on plaintiffs' failure to prove that

28

defendants' unauthorized use of the program caused confusion in the marketplace, plaintiffs' claim is dismissed.

### 4.    Tortious Interference

The two causes of action premised on tortious interference are "tortious interference with contract," and "tortious interference with prospective contract or business relations."  Lennon v. Seaman, 63 F. Supp. 2d 428, 433 (S.D.N.Y. 1999).  Plaintiffs' complaint alleges both.  (Pls.' Am. Compl.  ¶ 58, ¶ 64.)

### a.    Tortious Interference with Contractual Relations

The elements of a claim for tortious interference with contractual relations are: "i) the existence of a valid contract between the plaintiff and a third party; ii) defendant's knowledge of the contract; iii) defendant's intentional inducement of the third party to breach the contract or otherwise render performance impossible; and iv) damages to the plaintiff."  Lennon v. Seaman, 63 F. Supp. 2d 428, 433 ( S.D.N.Y. 1999) (citing Kronos, Inc. v. AVX Corp., 612 N.E.2d 289, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931 (1993)).  An actual breach of the contract is required. Lennon, 63 F. Supp. 2d at 433 (citing NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 664 N.E.2d 492, 87 N.Y.2d 614, 620, 641 N.Y.S.2d 581 (1996); see also D'andrea v. Rafla-Demtrious, 146 F.3d 63, 65-66 (2d Cir. 1998)).

In this case, plaintiff Davella, through his company JBS, contracted with the third party Broadway Famous on November 1, 1986. ( Pls.' Ex. D.)  The contract involved the licensing of the JBS computer program involved here as well as the regular maintenance of that computer program.  With respect to the second factor of knowledge of the contract, while  it is likely that Castro knew of Broadway's contract, it is not necessary to decide this, because there is no

evidence that Castro or Unique intentionally induced Broadway Famous to breach any contract with Davella or JBS. See Lennon v. Seaman, 63 F. Supp. 2d 428, 433 ( S.D.N.Y. 1999) (citing Kronos, Inc. v. AVX Corp., 612 N.E.2d 289, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931 (1993)). Plaintiff Davella testified that he lost Broadway as a client when Broadway's then-president stated that he was going to hire an in-house programmer to do the computer work. Accordingly, plaintiffs' claim for tortious interference with contractual relations is dismissed.

        b.      Tortious Interference with Prospective
                 Contract or Business Relations

A claimant alleging tortious interference with prospective contract or business relations must demonstrate that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Advance Relocation & Storage Co., Inc. v. Local 814, Int'l Brotherhood of Teamsters, AFL-CIO, 2005 WL 665119, at *12 (E.D.N.Y. March 22, 2005) (citing Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003) (citations omitted)). As discussed above, there is no evidence that the defendants intentionally interfered with plaintiffs' relationship between Broadway Famous and JBS. It can reasonably be inferred from all the testimony in this case that when Broadway had the right to stop using JBS, it had the right of exclusive and continued use of the program which it bought from JBS in 1986. Broadway hired a new company to do its computer programming and maintenance work in 1988. Defendant Castro was working for that company (USS). There is no evidence of interference, much less malice or dishonesty, relating to Broadway's decision to terminate the service of JBS in 1988. Accordingly, the plaintiffs' claim for tortious interference with prospective contract or business relations is

dismissed.

5.     Misappropriation of a Trade Secret

As part of the sixth cause of action, the plaintiffs allege that Castro's copying of the rental program constituted "tortious misuse of . . .  trade secrets."  (Pls.' Am. Compl. at ¶ 64.)  The plaintiffs also allege that "the stolen tape" contained a copy of Davella's program, and accordingly, Castro misappropriated a trade secret by delivering the tape to Party Rental.  (Id. at ¶ 24.)

A party claiming misappropriation of a trade secret must prove that: "'(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'" Bear, Sterns Funding, Inc.  v. Interface Group-Nevada, Inc., 2005 WL 639419, at *18 (S.D.N.Y. March 21, 2005); Fabkom, Inc. v. R.W. Smith & Assoc., Inc., 1996 WL 531873, at * 6 (S.D.N.Y. Sept. 19, 1996).  A trade secret is a confidential "formula, pattern, device or compilation of information which is used in one's business, and which gives [the business] an opportunity to obtain an advantage over competitors who do not know or use it."  Bear, Sterns Funding, 2005 WL 639419, at *19 (citing Ashland Management v. Janien, 624 N.E.2d 1007, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912 (1993) (quoting Restatement (First) of Torts § 757 cmt. b); Lehman v. Dow Jones & Co., 783 F.2d 285 (2d Cir.1986); Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp.2d 575, 607 (S.D.N.Y.2004)).  Trade secret claims are not preempted by copyright law because the requirement that the plaintiff prove that the defendant used the trade secret in breach of a duty constitutes the "extra element" that distinguishes trade secret causes of action  from pure copyright causes of action.  Computer Associates Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 717 (2d Cir. 1992).

Generally, computer programs are protectable as trade secrets under New York law. Altai, 982 F.2d at 717; Fabcom, 1996 WL 531973, at *6 (citations omitted). To determine whether a particular work qualifies as a trade secret, the court must consider six factors: "(1) the extent to which the information is known outside of [the claimant's] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the claimant] to guard the secrecy of the information; (4) the value of the information to [the claimant] and [claimant's] competitors; (5) the amount of effort or money expended by [the claimant] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Fabcom, 1996 WL 531973, at *6 (citing Restatement of Torts, § 757 cmt. b; Integrated Cash Management Serv., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990); Eagle Comtronics, Inc. v. Pico, Inc., 89 A.D.2d 803, 803-04, 453 N.Y.S.2d 470, 472 (4th Dep't 1982)).

In this case, the plaintiffs offered testimony and evidence that Castro copied the source code and menu screens from Davella's program. However, since any user of the program is privy to the menu screens, the menu screens can not be considered trade secrets. Accordingly, the Court will consider the plaintiffs' trade secret cause of action only with regard to defendants' misappropriation of Davella's source code and sale of the tape containing Davella's program.

On the first factor, it can reasonably be inferred from the evidence that the source code for plaintiffs' program was not intended to be known outside of JBS, except when authorized by the plaintiffs. On the second factor, the extent to which JBS employees knew the source code, Davella testified that JBS is a small company, and that most people in the office were aware of the work plaintiff was doing. (Tr. at 46.) The third factor concerns the degree to which the plaintiffs took

measures to guard the secrecy of the code.  Plaintiffs offered no direct testimony on this point; however, the JBS contract with Broadway Famous reveals that plaintiffs took some measures to protect the secrecy of the product.  The contract explicitly states that "the Client [Broadway] will not solicit any program that we have installed and maintained at the Client for the purposes of selling the software without the written agreement of the Consultant [JBS]."  (Defs.' Ex. D, ¶ 4.)  Based on this language, it can be inferred that the plaintiffs wanted to maintain control over outside access to the rental program.  On the fourth factor, Davella testified that at the time he was working on the program, there was no other program like it.  (Tr. at 21.)  He testified that he spent several months before writing the program just working with Broadway, in order to understand the party rental business and their needs.  (Id.)  Davella later sold the program to another party rental company called Service Party Rental (Id. at 75), suggesting that there was a market beyond Broadway for the program, and supporting the contention that by using a program like the one plaintiff designed, party rental companies could gain an advantage in the marketplace.  The fifth factor requires considering the amount of effort or money put in to developing the program.  Again, Davella testified that he spent between seven and nine months working closely with Broadway developing the program to meet their specific needs, and that at the time, no other program like it existed.  (Id. at 21.)  He testified that he then spent another three months actually creating the software (Id. at 74.)  In total, Davella spent close to a year producing the rental program.  Finally, the sixth factor concerns the ease or difficulty with which the code could be acquired or copied by others.  Plaintiffs offered no testimony on this factor, and defendant Castro did not testify as to how easy or difficult it was for him to access the source code from plaintiffs' program.

On the whole, examination of the plaintiffs' program according to the six factors outlined in

Fabcom suggests that the source code from plaintiffs' program was a trade secret. Accordingly, the Court must move to the second stage of analysis, in which the plaintiffs are required to prove that Castro was "using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'" Bear, Sterns Funding, Inc. v. Interface Group-Nevada, Inc., 2005 WL 639419, at *18 (S.D.N.Y. March 21, 2005); Fabkom, Inc. v. R.W. Smith & Assoc., Inc., 1996 WL 531873, at * 6 (S.D.N.Y. Sept. 19, 1996). The plaintiffs proved that Castro took the program while working for Broadway, in violation of Broadway's contract with JBS. The contract states that Broadway agreed not to "solicit any program that [JBS] installed and maintained at [Broadway] for the purposes of selling the software without the written agreement of [JBS]." (Defs.' Ex. D, at 2.) Additionally, Castro's theft of the back-up tape that contained the plaintiffs' program, along with Broadway's customer data, constitutes a discovery by improper means.

Based on the foregoing, the Court finds that plaintiffs prevail on the claim for misappropriation of a trade secret. The remaining issue however is what, if any, damages plaintiffs are entitled to recover based on this tort.

V.     Damages

    A.     Misappropriation of a Trade Secret

New York General Obligations Law § 15-108 provides that when a release is given to "one of two or more persons liable or claimed to be liable in tort for the same injury,"

> it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released

> tortfeasor's equitable share of the damages under article fourteen of the
> civil practice law and rules, whichever is the greatest.

N.Y. Gen. Oblig. Law § 15-108 (McKinney 1999).

The defendants argue that because plaintiffs received $20,000 as part of the settlement with Party Rental in exchange for releasing Party Rental and James McManus from this action, the plaintiffs cannot collect again. The plaintiffs contend that the law does not apply to this action because this is a contract action. (Pls.' Trial Mem. of Law at unnumbered page 4.) Misappropriation of a trade secret is not a contract claim. In the alternative, the plaintiffs argue that the value of the software is $75,000, and defendants should pay $55,000, an amount equivalent to the value of the software less the $20,000 plaintiffs received in payment from Party Rental. (Pls.' Pre-Trial Summary of Claims at 2, 5.)

N.Y. General Obligations Law applies to the misuse of a trade secret claim, which is a tort claim. The extent to which Party Rental's settlement and payment discharges Castro and Unique from liability rests on the degree to which the injury allegedly caused by Party Rental is the "same injury" caused by Unique and Castro. See N.Y. Gen. Oblig. Law § 15-108 (McKinney 1999). Here the injury is the same. In the complaint, plaintiffs assert every cause of action against all of the original named defendants, including Party Rental and McManus, jointly and severally. Further, the terms of the settlement specify that the agreement was reached "in full settlement of the action," in other words, the settlement provision did not apportion damages among the defendants. (Pls.' Ex. 14.) Accordingly, because plaintiffs collected $20,000 from defendants Party Rental and McManus in exchange for their release from the action, defendants Unique and Castro can not be held liable for the full amount of damages awarded in connection with the misuse of trade

secret claim.  N.Y. Gen. Obl. Law § 15-108.  <u>See also</u> <u>Screen Gems-Columbia Music, Inc., et al.</u> <u>v. Metlis & Lebow Corp.</u>, 453 F.2d 552, 554 (2d Cir. 1972).

Castro and Unique can only be held liable to the extent that plaintiffs' damages for the state law cause of action exceeds $20,000.00.  There is no evidence that the plaintiffs suffered damages in excess of $20,000.00 as a result of theft of the plaintiffs' trade secret.  Since the record is devoid of any proof as to damages, plaintiffs are awarded nothing in money damages on the misuse of trade secret claim.

   B.  <u>Copyright Infringement</u>

     1.  <u>Statutory Damages and Attorney's Fees</u>

   The Court finds that the plaintiffs have prevailed on the copyright cause of action.  Plaintiffs request damages in the amount of $75,000.00 per defendant, based on the alleged value of the program, plus $5,000 per defendant per year for each year defendants have been in possession of the program, plus interest.  (Pls.' Am. Compl. ¶¶ 65-66.)  Plaintiffs also seek an award of attorney's fees, costs, and disbursements.  (<u>Id.</u> ¶ 6 of Wherefore Clause.)

   Section 504 of the Copyright Act allows the plaintiff to seek actual damages plus any additional profits earned by the infringer or statutory damages as outlined in section 504(c).  <u>See</u> 17 U.S.C. § 504. In addition, the court has discretion to increase the award of statutory damages where the infringement was committed willfully.  <u>See id.</u> § 504(c)(2).  The court may also award reasonable attorney's fees to the prevailing party.  <u>See id.</u> § 505.

However, the court may not award statutory damages or attorney's fees where the copyright owner did not register the work prior to the infringement.  17 U.S.C. § 412(2)

(prohibiting the award of statutory damages and attorney's fees where "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work").  See also Softel, Inc. v. Dragon Med. & Scientific Communications, Inc., 1992 WL 168190, at *29 (S.D.N.Y. June 30, 1992), overturned on other grounds, 118 F.3d 955 (2d Cir. 1997).  Here, the copyright infringement occurred before  plaintiff Davella filed the copyright registration in November 2001.  Accordingly, the plaintiffs are not entitled to statutory damages or attorney's fees.

2.      Actual Damages

The plaintiffs are entitled to actual damages, which is an amount equal to the plaintiffs' lost profits plus the infringer's profits attributable to the infringement.  See 17 U.S.C. § 504.  The award of a plaintiff's lost profits seeks to compensate the owner for any harm he suffered by reason of the infringement.  On Davis v. Gap, Inc., 246 F.3d 152, 159 (2d Cir. 2001). The award of an infringer's profits seeks to insure that the infringer not benefit from his wrongdoing.  Id.

In this case, the plaintiffs seek actual damages in the amount of $75,000.00 per defendant, plus $5,000 for each year each defendant has been in possession of the allegedly stolen material, in addition to interest.  (Pls.' Am. Compl.  ¶¶ 65-66.)  The plaintiffs offered no evidence to support this claim of actual damages.  Plaintiff Davella testified that the fair market value of the software in 1999 was $75,000, but he did not explain how he arrived at this calculation, nor did he offer any evidence that JBS lost potential customers based on defendant Castro's infringement. (Tr. at 102, 106).  Accordingly this valuation is inadequate proof.

In On Davis v. Gap, Inc., 246 F.3d 152, 159 (2d Cir. 2001), the court held that in a case where the copyright owner proves that the defendant has infringed his work, and that a license to make such use of the work had a fair market value at the time of infringement, the copyright owner is entitled to an award of some damages, even where the owner has not shown that the infringement caused him lost sales, lost opportunities to license, or diminution in the value of the copyright. Gap, Inc., 246 F.3d 152 at 164-166. In Gap, Inc., the court stated that "finding the fair market value of a reasonable license fee may involve some uncertainty," but that to deny the owner damages in a case in which the owner has shown fair market value but has not proven loss of sales or licenses to third parties "would be that in such circumstances an infringer may steal with impunity." Id. at 166.

Nevertheless, in this case, plaintiffs failed to even prove at a minimum that the program license had a fair market value at the time of the infringement. Plaintiff Davella testified that the fair market value of the program in 1999 was $75,000, but this amount is entirely speculative and unreasonable, given that plaintiffs licensed the work to Broadway for $25,000 in 1986. The value of a computer program naturally diminishes over time. Moreover, the program was tailored to the individual needs of a single customer– Broadway. Additionally, Castro sold this version of the program, which plaintiff Davella acknowledged had added features (Tr. at 89), for $20,000 in 1999. However, it is only reasonable to infer– since this was an unauthorized and unlawful transaction– that a substantial portion of that value was for the business information on those programs belonging to Broadway. The purchaser– Party Rental– is an acknowledged competitor of Broadway.

Further, plaintiffs only submitted as evidence ten percent of the JBS program, and from this

ten percent, the plaintiffs made no showing as to which elements were copyrightable. The Court

will not engage in speculation as to the percentage of the JBS program that was copyrightable, or

the percentage of the JBS program that was actually copied. It was the plaintiffs' burden to prove

damages by a preponderance of the evidence. They have failed to do this. Based on plaintiffs'

failure to adequately prove damages, the plaintiffs are awarded nothing for the copyright violation

of the JBS rental program.

3.      <u>Injunction and Impoundment</u>

The plaintiffs seek to enjoin defendants from copying, distributing, selling,

or providing any party with copies of the JBS program, or any elements associated with the

program. (<u>Id.</u> ¶ 1, ¶ 2 of Wherefore Clause.) The plaintiffs also request the issuance of an order

for the seizure and impoundment of all copies of the JBS program, in any form, in the defendants'

possession or under their control. (<u>Id.</u> ¶ 3 of Wherefore Clause.)

Section 502 of the Copyright Act authorizes the court to grant a final injunction on such

terms as it deems reasonable to prevent or restrain infringement of a copyright. 17 U.S.C. § 502.

Additionally, Section 503 of the Copyright Act authorizes the court, as part of a final judgment or

decree, to order the destruction or other reasonable disposition of all materials found to have been

made or used in violation of the copyright owner's exclusive rights. 17 U.S.C. § 503.

I find that plaintiffs are entitled to the return of all programs containing any portion or

portions of the JBS program that are in defendants' possession or, alternately, that are in the

possession of a third party known to the defendants. Defendants are enjoined from any further use

of any program or programs containing any copyrighted portion of the JBS program at issue in this

action.

<u>CONCLUSION</u>

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that defendants Castro and Unique be prohibited from any future use of any portions of the party rental program that belong to the plaintiffs by virtue of their copyright registration in the program.

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED, that defendants Castro and Unique are directed to turn over to the plaintiffs any computer programs in their possession that contain copyrighted elements of the plaintiffs' rental program, including any programs that use the plaintiffs' source code and/or menu screens.  Defendants are also directed to obtain and turn over to plaintiffs any such programs that, to their knowledge, are presently in the possession of third parties.

The Clerk of the Court is directed to enter judgment against defendants Unique Software Support Corporation and Alan Castro as provided herein, with costs, and mark this case as closed.

SO ORDERED.

Dated: Central Islip, New York
      May 26, 2005

                                        /s/ E.  Thomas Boyle
                                        E. THOMAS BOYLE
                                        United States Magistrate Judge